IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

JOHN TAYLOR, *on behalf of himself and*   )
*others similarly situated,*   )
      Plaintiff,   )
  )
    v.   )       Civil Action No.  3:18cv378 (MHL)
  )
TIMEPAYMENT CORPORATION,   )
      Defendant.   )
_____)

## REPORT AND RECOMMENDATION

This matter comes before the Court on Defendant Timepayment Corporation's

("Timepayment") Motion to Dismiss (ECF No. 16), after having been referred to the

undersigned by United States District Judge M. Hannah Lauck.  (ECF No. 25.)  Plaintiff John

Taylor ("Plaintiff") alleges that his consumer equipment lease agreement with Timepayment

violates various provisions of the Consumer Leasing Act ("CLA"), 15 U.S.C. § 1667 *et seq.*, the

Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, and Virginia state law.  Timepayment

moves to dismiss Plaintiff's Complaint (ECF No. 1) pursuant to Federal Rules of Civil Procedure

12(b)(1) and 12(b)(6), arguing that Plaintiff lacks standing and that Plaintiff has failed to state a

claim under both federal and state law.  For the reasons set forth below, the Court recommends

that Timepayment's Motion be GRANTED in part and that Counts I, II and IV of Plaintiff's

Complaint be DISMISSED.  The Court further recommends that Timepayment's Motion be

DENIED as to Counts III and V.

## I.    BACKGROUND

In October 2017, Plaintiff purchased a new heat pump for his home from Williams and Fogg Heating & Air Co. ("Williams and Fogg"). (Compl. (ECF No. 1) ¶¶ 37-40.) The cost of the pump and installation totaled $5,325. (Compl. ¶ 40.) On recommendation from Williams and Fogg, Plaintiff entered into a consumer equipment lease agreement (the "Agreement"), dated October 27, 2017, with Timepayment to finance the purchase and installation of the pump. (Compl. ¶¶ 38-39; Ex. A to Compl. (ECF No. 1-1) ("Agreement").)

The Agreement required Plaintiff to make an initial payment of $384.72 and twenty-one subsequent monthly payments of $410.44. (Compl. ¶ 41; Agreement at 1.) Upon expiration of the twenty-one-month term, the Agreement provided that Plaintiff could either return the heat pump at his own expense or purchase the heat pump for "fair market value" in an amount not to exceed the sum of three monthly lease payments — totaling $1,231.32. (Compl. ¶ 43-44; Agreement at 1.) The Agreement also contained an early termination provision, which required Plaintiff to return the heat pump and pay an "Early Termination Balance," consisting of (i) any amount due to Timepayment at the time of the early termination, (ii) all remaining monthly payments due through the end of the Agreement (at a discounted rate of four percent) and (iii) "any expenses incurred and taxes payable to [Timepayment] as a result of early termination." (Compl. ¶ 61; Agreement § 20.)

As of June 4, 2018 — the date that Plaintiff filed his Complaint — Plaintiff remained current on all payments to Timepayment. (Compl. ¶ 50.) Should Plaintiff choose to return the heat pump at the end of the term, the cost of the Agreement, including the initial payment of $384.72, twenty-one monthly payments of $410.44 and the equipment removal and return cost (unknown), would total more than $9,003.46. (Compl. ¶ 45.) If, on the other hand, Plaintiff

elects to purchase the pump at the end of the term, the total cost of the Agreement would increase to $10,235.28, assuming the heat pump has a maximum fair market value of $1,231.32. (Compl. ¶ 46.)

Plaintiff filed this class action suit against Timepayment on June 4, 2018. (Compl. at 1.) In Count I, Plaintiff alleges that the Agreement violates § 1667a of the CLA and its implementing regulation, 12 C.F.R. § 1013.4 ("Regulation M"). (Comp. ¶¶ 139-59.) In Count II, Plaintiff alleges that the Agreement violates § 1667b(b) of the CLA. (Compl. ¶¶ 160-70.) In Count III, Plaintiff alleges that the Agreement failed to provide the disclosures required by § 1638(a) of the TILA. (Compl. ¶¶ 171-84.) Finally, in Counts IV and V, Plaintiff asserts that the agreement violates §§ 6.2-303 and 8.9A-802 of the Virginia Code. (Compl. ¶¶ 185-214.) Plaintiff brings this suit as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of four classes, including a CLA class, a TILA class, a Virginia Security Interest Class and a Virginia Usury Class. (Compl. ¶ 125.)

On August 10, 2018, Timepayment filed a Motion to Dismiss Plaintiff's complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, arguing that Plaintiff lacks standing to bring Counts I, II and IV, and failed to state a claim in Counts III, IV and V. (Timepayment's Mem. in Supp. of Mot. to Dismiss (ECF No. 17) ("Timepayment's Mem.") at 5, 18.) Plaintiff filed his response in opposition to Timepayment's Motion on August 30, 2018. (Pl.'s Mem. of Law in Opp'n to Timepayment's Mot. to Dismiss (ECF No. 18) ("Pl.'s Resp.").) And Timepayment replied on August 30, 2018, rendering this matter ripe for review. (Timepayment's Reply (ECF No. 20).)

## II.    LEGAL STANDARD

A defendant moving to dismiss a claim pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges the Court's subject-matter jurisdiction over the complaint. Article III of the Constitution limits federal courts' jurisdiction to "Cases" and "Controversies." U.S. Const. Art. III, § 2.  To satisfy the case-or-controversy requirement of Article III, Plaintiff must establish his standing to sue. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Specifically, Plaintiff must show that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016) (citing *Lujan*, 504 U.S. at 560-61 (additional citations omitted)).  The Court must dismiss an action if it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3).

In a class action, the Court "analyze[s] standing based on the allegations of personal injury made by the named plaintiff[ ]. 'Without a sufficient allegation of harm to the named plaintiff in particular, [he] cannot meet [his] burden of establishing standing.'" *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 343 (4th Cir. 2017) (quoting *Beck v. McDonald*, 848 F.3d 262, 269-70 (4th Cir. 2017), *cert. denied sub nom. Beck v. Shulkin*, 137 S. Ct. 2307 (2017) (additional citations omitted)).  As the party invoking federal jurisdiction, Plaintiff bears the burden of establishing all three elements of standing. *Id.*

A motion to dismiss under Rule 12(b)(6), on the other hand, tests the sufficiency of a complaint; "importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citations omitted).  The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the

defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint must contain "more than labels and conclusions" or "formulaic recitation of the elements of a cause of action." *Id.* (citations omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level," to one that is "plausible on its face," rather than merely "conceivable." *Id.* at 555, 570.

In considering such a motion, the Court takes the plaintiff's well-pleaded allegations as true and views the complaint in the light most favorable to the plaintiff, drawing all reasonable inferences in the plaintiff's favor. *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012) (citations omitted); *T.G. Slater & Son, Inc. v. Donald P. & Patricia A. Brennan LLC*, 385 F.3d 836, 841 (4th Cir. 2004) (citations omitted). Legal conclusions enjoy no such deference. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts also look to the documents explicitly incorporated by reference into the complaint, as well as those attached as exhibits to the complaint. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Although typically constrained to the allegations within the complaint itself at this stage, the Court may also "consider a document submitted by the movant that was not attached to or expressly incorporated in [the] complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (citations omitted).

## III.   ANALYSIS

### A.   Plaintiff Failed to Allege a Concrete Injury in Fact in Counts I, II and IV.

Timepayment argues that Plaintiff lacks standing to bring Counts I, II and IV, because Plaintiff failed to show that he suffered a concrete injury in fact. (Timepayment's Mem. at 5-

17.) Plaintiff argues that he has suffered a concrete injury, because the Agreement's missing disclosures "effectively trapped [Plaintiff] into paying usurious interest on his heat pump," violated his substantive rights and prevented him from seeking alternative financing. (Pl.'s Resp. at 10-20.)

To show the first constitutionally required element of standing — injury in fact — "a plaintiff must show 'an invasion of a legally protected interest' that is (1) 'actual or imminent,' (2) 'particularized' to the plaintiff, and (3) 'concrete.'" *Brown v. R & B Corp. of Virginia*, 267 F. Supp. 3d 691, 696 (E.D. Va. 2017) (quoting *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560-61)). The "actual or imminent" risk analysis explores whether the injury "has actually occurred or is certainly impending." *Id.* at 696 n.6 (quotations omitted). "[C]onjectural or hypothetical" injuries do not suffice. *Spokeo*, 136 S. Ct. at 1548. A particularized injury "affects the plaintiff in a personal and individualized way." *Id.* (citations omitted). Finally, courts have described concrete injuries as "*de facto*" injuries that actually exist and are not merely abstract. *Id.*; *Dreher*, 856 F.3d at 344 (quoting *Spokeo*, 136 S. Ct. at 1548).

Concrete injuries need not necessarily be tangible. *Spokeo*, 136 S. Ct. at 1549 (citations omitted) (listing deprivations of free speech and the free exercise of religion as examples of intangible concrete injuries). Courts primarily rely on history and "the judgment of Congress" to determine whether an intangible harm meets the standing requirements of Article III. *Id.* When an intangible harm possesses no common law analog, Congress may — through the enactment of statutes — elevate it to a "legally cognizable . . . concrete, *de facto* injur[y]." *Id.* (quoting *Lujan*, 504 U.S. at 578). But congressional recognition of an intangible harm does not supplant Article III standing, which "requires a concrete injury even in the context of a statutory violation." *Id.*

"Informational injuries" constitute one type of intangible harm identified and elevated by Congress in various consumer protection statutes. *Dreher*, 856 F.3d at 345. A concrete informational injury "requires that a person lack access to information to which he is legally entitled *and* that the denial of that information creates a 'real' harm with an adverse effect." *Id.* (citing *Spokeo*, 136 S. Ct. at 1549 (emphasis supplied)). Moreover, the harm resulting from the denial of information must be "the type of harm *Congress sought to prevent* by requiring disclosure." *Id.* at 345-46 (quoting *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016) (emphasis in original)).

When a statute guarantees the dissemination of information, and the denial of that information carries a "real risk of harm," the plaintiff "need not allege any *additional* harm beyond the one Congress has identified" to establish a concrete injury in fact. *Spokeo*, 136 S. Ct. at 1549 (emphasis supplied). In contrast, "bare procedural violation[s] . . . divorced from any concrete harm" do not satisfy Article III's injury-in-fact requirement. *Id.* For example, in *Dreher*, the Fourth Circuit found no concrete injury in fact where a credit reporting agency disclosed the incorrect name of its source of information on a consumer's credit report. 856 F.3d at 345-46. Although the Fair Credit Reporting Act ("FCRA") required the credit reporting agency to disclose its sources of information, the consumer could not identify *how* the misinformation listed on his report "adversely affected his conduct in any way." *Id.* at 347 (noting that the consumer could still "receive a fair and accurate credit report, obtain the information he needed to cure his credit issues, and ultimately resolve those issues").

### 1. *Plaintiff Lacks Standing in Count I.*

In Count I, Plaintiff alleges that the disclosures provided in the Agreement by Timepayment do not comport with §§ 1667a(5) and (9) of the CLA and §§ 1013.3(a)(2) and

1013.4(c), (e), (i) and (j) of Regulation M.  (Compl. ¶¶ 139-59.)  Timepayment argues that

Plaintiff's allegations in Count I do not amount to a concrete injury in fact, because Plaintiff has

merely alleged technical violations of the CLA and Regulation M, and failed to demonstrate that

he suffered any actual harm.  (Timepayment's Mem. at 7-8.)  Plaintiff responds that he suffered

intangible harm, because Timepayment's failure to comply with the disclosure requirements in

the CLA and Regulation M "violated his substantive rights" and "created a material risk of harm

to the very interest that the statutes protect."  (Pl.'s Resp. at 12-15.)[1]

    In support of its argument that Plaintiff lacks standing, Timepayment relies on — and the

undersigned likewise finds persuasive — the district court's decision in *Cottle v. Monitech*, 2017

WL 6519024 (E.D.N.C. Dec. 20, 2017), *aff'd* 733 Fed. App'x 136 (4th Cir. 2018).

(Timepayment's Mem. at 11-12.)  In that case, the plaintiff similarly alleged that her consumer

lease agreement with the defendant violated the CLA and Regulation M, because the defendant

did not provide separate documentation with segregated disclosures and omitted other required

disclosures.  *Monitech*, 2017 WL 6519024, at *2.  As a result of the missing information, the

plaintiff alleged that she felt "confused as to certain [lease] provisions, including the total

---

[1]    Plaintiff further argues that he has suffered a tangible harm under the CLA, because he
"unwittingly paid a usurious rate" on the heat pump. (Pl.'s Resp. at 11-12.) This argument
misses the mark, because the Agreement, when construed as a consumer *lease* under the CLA,
does not constitute a loan or forbearance of money subject to Virginia's usury law. As explained
in Part C below, only transactions involving "a loan of money or a forbearance of an existing
indebtedness" trigger Virginia's usury law, which caps interest rates on loans at 12 percent per
year. Va. Code § 6.02-303(A); *Galloway v. Bluegreen Vacation Club*, 2012 WL 113862, at *3
(E.D. Va. Jan. 13, 2012). Courts have held that a lease does not constitute a loan or forbearance
of money subject to the definition of usury. *See, e.g., Orix Credit All., Inc. v. Northeastern Tech
Excavating Corp.*, 222 A.D.2d 796, 798 (N.Y. App. Div. 1995). Thus, the Agreement, when
viewed as a lease, does not fall within the reach of Virginia's usury law.

amount of money owed . . . and whether she had the option to purchase the leased property at the conclusion of the lease[.]" *Id.*

The court explained that Congress enacted the CLA (an amendment to the TILA) to prevent the "deception, misinformation, and obliviousness to the true costs of credit or lease terms . . . encountered by inexperienced or uninformed consumers." *Id.* at \*3 (citing *Thomka v. A.Z. Chevrolet, Inc.*, 619 F.2d 246, 249 (3d Cir. 1980)). But the plaintiff alleged only that the missing disclosures confused her as to the true cost of the lease, which the court found distinguishable from allegations of deception, misinformation and obliviousness. *Id.* In addition to not experiencing the type of harm that Congress designed the CLA to prevent, the plaintiff failed to allege that the missing disclosures adversely affected her conduct. *Id.* (citing *Dreher*, 856 F.3d at 346-47.) Because the plaintiff did not allege "that she would have evaluated the terms of her lease differently, made a different choice had she been presented with additional information, or in any way behaved other than she did had defendant not committed its alleged violations of the CLA," the court held that the plaintiff's alleged injury constituted a mere procedural violation that did not satisfy Article III. *Id.*

Plaintiff's allegations in Count I likewise do not muster standing under Article III. First, Plaintiff argues that the Agreement failed to adequately disclose the total sum of periodic payments and the total sum of all payments due under the lease in accordance with § 1667a(9) and 12 C.F.R. §§ 1013.4(c) and (e). Section A of the Agreement, titled "**MONTHLY PAYMENT**" stated that the lessee (Plaintiff) would make twenty-one monthly payments of $410.44 to the lessor (Timepayment). (Agreement § A at 1.) Section B of the Agreement, titled "**PAYABLE AT SIGNING**," stated that Plaintiff owed $384.72 upon signing the agreement. (Agreement § B at 1.) And § C of the Agreement, titled "**TOTAL OF PAYMENTS/PAPER**

**BLLING FEE**," reiterated that Plaintiff would make monthly payments of $410.44 for twenty-one months, totaling $8,619.24. (Agreement § C at 1.)

Plaintiff argues that Timepayment "misleadingly represented" the true cost of the lease by listing only the total sum of monthly payments in § C, rather than listing the total sum of monthly payments ($8,619.24), plus the initial payment and any other associated costs. [2] (Compl. ¶¶ 103, 158, Agreement at 1.)  Specifically, Plaintiff takes issue with line two of § C, which reads: "The amount I [Plaintiff] will have paid by the end of the lease: $8,619.24." (Compl. ¶ 145; Agreement § C at 1.)  But the very next line of § C makes clear that the "$8,619.24" represents the "Total Monthly Lease Payment x Lease Term." (Agreement § C.) Thus, the Agreement did disclose the total sum of periodic payments.  Although Timepayment failed to list the combined amount of the initial and monthly payments, Timepayment points out that the Agreement conspicuously lists those amounts next to each other in §§ B and C. (Timepayment's Mem. at 8; Timepayment's Reply at 4-6.)  Plaintiff merely faults Timepayment for failing to add these two sums together.

Second, Plaintiff asserts that Timepayment's description of Plaintiff's option to purchase the pump at the end of the lease term violated § 1667a(5) and 12 C.F.R. § 1013.4(i).  The first page of the Agreement contains a section titled "**Non-segregated disclosures required under Regulation M**." (Agreement at 1.)  Under that section, the Agreement reads, "**PURCHASE**

---

[2]        Specifically, Plaintiff argues that Timepayment also should have included the cost of removing and returning the equipment at the end of the lease in the total sum of payments. (Compl ¶ 148.)  However, § 14 of the Agreement, titled "**RETURN OF THE PROPERTY**," makes clear that Plaintiff must return the heat pump *at his own expense* at the end of the lease term, should he decide not to purchase the pump.  (Agreement § 14.)  Based on this language, Plaintiff could presumably remove and return the heat pump himself or delegate the labor to a third party other than Timepayment.  As such, Timepayment needed not to include a "pick-up" fee in the total of payments, as suggested in the Model Form.  (*See* Ex. B. to Compl. ("Model Form") (ECF No. 1-2) at 1.)

**OPTION AT END OF LEASE TERM**. I [Plaintiff] have an option to purchase the leased Equipment at the end of the Lease Term for its fair market value, not to exceed 3 regular monthly payments . . . ." (Agreement at 1.) Plaintiff alleges that this "partial explanation" "leaves open the true 'purchase price' for the equipment." (Compl. ¶¶ 150-52.) Again, Plaintiff faults Timepayment for failing to provide an exact number, despite the fact that the Agreement clearly explained that the purchase price of the pump would not exceed the total of three monthly payments of $410.44, or $1,231.32.

Third, Plaintiff argues that the Agreement failed to comport with § 1014.3(j)'s requirement that lessors disclose "in a segregated manner, '[a] statement that [Plaintiff] should refer to the lease documents for additional information on early termination, purchase options and maintenance responsibilities, warranties, late and default charges, insurance and any security interests, if applicable.'" (Compl. ¶ 153 (quoting 12 C.F.R. § 1014.3(j)).) But under the non-segregated disclosures section on page one, the Agreement states, "**OTHER IMPORTANT TERMS**. Information on early termination, purchase option and maintenance responsibilities, warranties, late and default charges, insurance and security interest, if applicable, is set forth below." (Agreement at 1.) Because the Agreement uses the verbatim language of the regulation, the undersigned interprets Plaintiff's allegation in the Complaint as challenging the placement of the notice in the Agreement, i.e., that Timepayment did not present the notice "in a segregated manner." Finally, Plaintiff argues that Timepayment violated § 1013.3(a)(2) of Regulation M, because Timepayment did not provide the required disclosures "in a manner substantially similar to the applicable model form in Appendix A" of Regulation M. (Compl. ¶ 98 (quoting 12 C.F.R. § 1013.3(a)(2)); Model Form.)

11

To the extent that the Agreement does not perfectly comply with the disclosure requirements of the CLA and Regulation M, these alleged procedural violations do not amount to a concrete injury in fact. Like the lessee in *Monitech*, Plaintiff failed to allege how any deficiencies with the disclosures deceived him or left him oblivious to the true cost of the lease — the type of injury that Congress intended the CLA to prevent. *Monitech*, 2017 WL 6519024, at *3. Although Plaintiff describes Timepayment's failure to add certain payments amount together in § C of the Agreement as "misleading," the undersigned agrees with Timepayment that this allegation amounts to no more than the confusion alleged by the lessee in *Monitech*. (Compl. ¶ 103; Timepayment's Mem. at 12.)[3] Moreover, Plaintiff did not allege that he would have taken a different course of action had the Agreement's disclosures better complied with the CLA and Regulation M. *Monitech*, 2017 WL 6519024, at *3.

Attempting to distinguish his case from *Monitech*, Plaintiff asserts that he properly alleged "his obliviousness to the true financing costs involved in the Agreement" and "how he would have changed his behavior had he known of the effective [Annual Percentage Rate ("APR")]." (Pl.'s Resp. at 19 (citing Compl. ¶¶ 183-84).) Plaintiff relies on the district court's decision in *Danger v. Nextep Funding, LLC*, 2019 WL 296564, at *6-7 (D. Minn. Jan. 23, 2019),

---

[3]      In Count I, Plaintiff also alleged that he "was unaware of the true financing costs associated with the purchase of his heat pump as a result of [Timepayment's] inadequate [CLA] disclosures." (Compl. ¶ 158.) As explained below, the CLA — unlike the TILA — does not require disclosure of "the amount financed" or an agreement's "finance charge." *See* 15 U.S.C. § 1638(a)(2)(A)-(3) (requiring consumer credit transactions to disclose finance charges). Even if the Court construed ¶ 158 of Plaintiff's Complaint as an allegation that Plaintiff "was oblivious to the true cost of [his] lease transaction," which does constitute the type of injury that Congress designed the CLA to prevent, *Monitech*, 2017 WL 6519024, at *3, Plaintiff still fails to establish a concrete injury in fact, because he does not allege that Timepayment's procedural violations of the CLA adversely affected his conduct, *Dreher*, 856 F.3d at 346-47.

to show that these allegations suffice to establish an injury in fact under the CLA. (Pl's Mot. for Leave to File Supp. Auth. (ECF No 27).)[4]

The plaintiff in *Danger* entered into an agreement with Nextep to finance her purchase of a dog. 2019 WL 296564, at *1. The agreement, titled as a lease, required the plaintiff to make an in-store payment of $173.28 and twenty-three subsequent monthly payments of $138.28. *Id.* Rather than multiply the number of months in the lease term by the amount of a single monthly payment, the agreement listed "$138.28" — the amount of one monthly payment — as the "Total of Your Monthly Payments." *Id.* at *2. The agreement also stated that plaintiff would pay a total of $3,318.73 by the end of the lease, but this amount did not include a $35 warranty fee, the $103.64 "disposition fee" applied if the plaintiff returned the dog at the end of the lease or, in the alternative, the $207.28 charge applied if the plaintiff decided to keep the dog. *Id.* at *9. The agreement identified Monterey, another loan servicing company, as payee for all of the debt arising from the pet lease agreement. *Id.* at *1-2. The plaintiff brought suit, alleging that Nextep violated the CLA by failing to disclose the total amount of periodic payments owed under the agreement, and that both Nextep and Monterey violated the TILA and Minnesota's usury law by failing to disclose, *inter alia*, the finance charge and "exorbitant" APR of 120 percent associated with the pet lease. *Id.* at *2. The defendants challenged the plaintiff's standing to bring claims under the CLA and the TILA. *Id.* at *3.

Applying *Spokeo*'s standing requirements, the *Danger* court held that the plaintiff had standing to seek monetary relief for her claims under both the CLA and the TILA, because the

---

[4]     The Court granted Plaintiff's Motion for Leave to File Supplemental Authority on January 30, 2019. (ECF No. 28.)  In accordance with the Court's January 30 Order, Timepayment filed a brief response on February 1, 2019.  (Timepayment's Resp. to Pl.'s Supp. Auth. (ECF No. 29) ("Timepayment's Supp. Resp.").)

pet lease failed to adequately disclose the total amount that the plaintiff owed under the Agreement, the total finance charge and the finance charged expressed as an APR. *Id.* at *7. The court explained,

> These allegedly inadequate disclosures created a risk of real harm to a concrete interest that both the TILA and the CLA were enacted to protect — the informed use of credit. And, in this case, Danger has plausibly alleged that 'real harm' materialized, as she continues to pay an interest rate of more than 120% for her dog. Further, Plaintiff alleges that she chose not to shop for credit or obtain alternative financing at a better rate because of Defendants' allegedly inadequate disclosures. For all of these reasons, the Court finds that Plaintiff has properly alleged standing to seek monetary relief for her claims under the TILA and CLA.

*Id.* (citations omitted). Timepayment attempts to distinguish *Danger* by arguing that Plaintiff did not allege how he would have altered his behavior had the Agreement better complied with the CLA; therefore, he lacks standing. (Timepayment's Supp. Resp. at 2; Compl. ¶¶ 139-59.) But a close reading of *Danger* reveals that the plaintiff in that case also did not allege how she would have changed her behavior had the pet lease complied with the CLA. 2019 WL 296564, at *6-7. Rather, the plaintiff alleged that she would have shopped for credit or secured a loan had the pet lease complied with the TILA by disclosing the finance cost and interest rate associated with the agreement, and the court found those allegations sufficient to confer standing under both the CLA and the TILA. *Id.*[5]

---

[5] Specifically, the plaintiff's amended complaint alleged that "[b]y not disclosing this very high finance charge [of 120 percent], Defendants effectively hid from [Danger] the true cost of the credit that they were extending her, and took from her the ability to shop intelligently for alternative financing. Had [Danger] known the effective interest rate [was] so high, she would have pursued other financing options such as using a credit card or obtaining a personal loan through her credit union." *Id.* The court found these allegations sufficient to establish a concrete injury in fact under both the CLA and the TILA. *Id.* at *7. But it is clear that these allegations of harm pertain only to the defendants' alleged violations of the TILA for two reasons. First, the plaintiff discusses disclosure of finance charges and interest rates, which the CLA does not require. Second, the plaintiff brought her CLA claim against Nextep only, but the portion of the amended complaint quoted above refers to both defendants (Nextep and Monterey). *Id.* at *6-7.

Here, Plaintiff likewise alleged that "had [he] been made aware of the true cost of [Timepayment's] credit, he would have pursued alternative financing options," and that Timepayment's "failure to disclose the excessive interest rate — over 77% — prevented him from . . . intelligently compar[ing] finance options." (Compl. ¶¶ 183-84). These allegations pertain to Plaintiff's claim under § 1638(a) of the TILA (Count III). (Compl. ¶¶ 171-84.) The TILA, which governs consumer credit transactions, requires creditors to disclose the "finance charge" of the transaction, the "finance charge expressed as an [APR]" and the "total of payments," which is the "the sum of the amount financed and the finance charge[.]" 15 U.S.C. § 1638(a). Neither the CLA nor Regulation M require any such disclosures. And the terms "finance charge" and "APR" appear nowhere in the Model Form. Although Regulation M requires disclosure of the "total of payments," it defines the total using different terminology than the TILA. *Compare* 12 C.F.R. § 1013.4(e) (requiring consumer lease agreement to list the total of payments "with a description such as 'the amount you will have paid by the end of the lease'" (minus amounts paid at signing)), *and* Model Form at 1 (describing total of payments as "[t]he amount you will have paid by the end of the lease"), *with* 15 U.S.C. § 1638(a)(5) (describing the total of payments as "the sum of the amount financed and the finance charge").

Despite the differences in disclosure requirements, the court's standing analysis in *Danger* made no appreciable distinction between the actual harm stemming from the alleged CLA violations and the alleged TILA violations. 2019 WL 296564, at *6-7. Instead, the court held that the plaintiff suffered a concrete injury in fact under both statutes by alleging that she would have sought alternative funding "had Defendants disclosed the actual interest rate" associated with the pet lease — a disclosure *not* required under the CLA. *Id.*

15

By conflating the harm resulting from separate procedural violations under the CLA and the TILA, the *Danger* court ignored the Supreme Court's instruction in *Spokeo* to consider "whether the *particular* procedural violations alleged . . . entail a degree of risk sufficient to meet the concreteness requirement [of Article III]." 136 S. Ct. at 1550 (emphasis added); *see Strubel v. Comenity Bank*, 842 F.3d 181, 191 n.9 (2d Cir. 2016) ("We heed *Spokeo*'s instruction to consider separately the risk of harm from each of the particular procedural violations alleged in this case[.]" (citations and quotations omitted)); *see also Miller v. Nissan Motor Acceptance Corp.*, 362 F.3d 209, 225 (3d Cir. 2004) ("[S]tanding to assert § 1667a disclosure claims [under the CLA] does not establish the injury required to assert substantive claims under § 1667b. A [p]laintiff may have standing to challenge certain practices, but not others.").

Because the *Danger* court failed to consider whether each procedural violation alleged by the plaintiff under the CLA and the TILA separately resulted in a concrete injury in fact, the Court finds the decision in *Monitech*, 2017 WL 6519024, at *3 — issued by another court similarly bound by the Fourth Circuit's opinion in *Dreher* — to be more persuasive.[6] Like the lessee in that case, Plaintiff alleged no facts showing how he would have altered his behavior had the Agreement's disclosures better complied with the CLA and Regulation M. *Monitech*, 2017 WL 6519024, at *3. And Plaintiff's allegations that he would have sought alternative financing had he known the true cost of Timepayment's credit and the interest rate associated with the Agreement establish a concrete injury in fact under the TILA only. (Compl. ¶¶ 183-84.) Thus, Plaintiff's allegations in Count I do not satisfy Article III.

---

[6]     To the extent that *Danger* also supports Plaintiff's opposition to Timepayment's Motion to Dismiss Counts III (TILA claim) and V (Virginia usury law claim), the Court gives the supplemental authority no deference, because those Counts survive Timepayment's Motion and *Danger* does not warrant a different outcome. *See* 2019 WL 296564, at *10-14 (denying motion to dismiss plaintiff's TILA and Minnesota usury law claims).

Alternatively, Plaintiff argues that Timepayment's procedural violations of the CLA *alone* give rise to a concrete injury, because the statutory violations present "a risk of real harm" to the interests that Congress designed the CLA to protect. (Pl.'s Resp. at 14 (quoting *Robins v. Spokeo*, 867 F.3d 1108, 1113 (9th Cir. 2017) (quoting *Strubel*, 842 F.3d at 190)).) In *Strubel*, the Second Circuit held that the plaintiff credit card holder suffered a concrete and particularized injury under the TILA as a result of the defendant bank's failure to disclose to the plaintiff that "(1) certain identified consumer rights pertain only to disputed credit card purchases not yet paid in full, and (2) a consumer dissatisfied with a credit card purchase must contact the creditor in writing or electronically." *Strubel*, 842 F.3d at 190. The Second Circuit held that the plaintiff need not allege "any *additional* harm" to establish a concrete injury, because "[a] consumer who is not given notice of *his* obligations is likely not to satisfy them and, thereby, unwittingly lose the very credit rights that the law affords him." *Id.* (emphasis supplied).

On the other hand, the *Strubel* court found that the plaintiff lacked standing to challenge the bank's failure to disclose its obligation to acknowledge billing errors and to inform the consumer when it corrected billing errors. *Id.* at 192-93. The court explained that those defective disclosures did not "present any material risk of harm" to the plaintiff's credit behavior. *Id.* at 190, 193 (quoting *Spokeo*, 136 S. Ct. at 1550) ("[I]n the absence of any plausible claim of adverse effects on consumer behavior, the procedural violation here might well cause no harm to a consumer's concrete TILA interests in informed credit decisions."). Thus, the court drew a line between the harm caused by the failure to disclose the consumer's personal obligations and the bank's obligations. *Id.* at 193. Only the former gave rise to a concrete injury, because the missing information "risks a consumer's ignorance of obligations necessary to his credit rights." *Id.* at 191 n.5, 193.

Here, Plaintiff likewise argues that he need not allege any additional harm resulting from Timepayment's violations of the CLA and Regulation M, because the Agreement's defective disclosures pertained to "[his] *own* actions and decision-making" under the lease, including the total amount of payments that Plaintiff owed and his option to purchase the heat pump at the end of the lease. (Pl.'s Resp. at 15.) The undersigned declines Plaintiff's invitation to extend the reasoning of *Strubel* — a case about violations under the TILA — to the CLA claims at issue here. Doing so would directly contradict the precedent set by the district court in *Monitech*, which the Fourth Circuit affirmed. *Monitech*, 733 F. App'x at 136. It bears repeating that the *Monitech* court, relying on *Spokeo* and the Fourth Circuit's decision in *Dreher*, found that the lessee's allegations that the defendant failed to comply with the disclosure requirements of the CLA and Regulation M — the same allegations that Plaintiff asserts here — did not constitute a concrete injury in fact, because the lessee failed to allege any adverse effects stemming from the procedural violations. *Monitech*, 2017 WL 6519024, at *2-3 (citing *Spokeo*, 136 S. Ct. at 1548; *Dreher*, 856 F.3d at 346-47).

For these reasons, Plaintiff has failed to allege a concrete injury in fact in Count I.

### 2.    *Plaintiff Lacks Standing in Count II.*

In Count II, Plaintiff alleges that Timepayment violated §1667b(b)[7] of the CLA by imposing an unreasonable penalty on Plaintiff if he terminates the Agreement early. (Compl.

---

[7]    Section 1667b(b) of the CLA provides that "[p]enalties or other charges for delinquency, default, or early termination may be specified in the lease but only at an amount which is reasonable in light of the anticipated or actual harm caused by the delinquency, default, or early termination, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy." 15 U.S.C. § 1667b(b).

¶¶ 160-70.)  Timepayment argues that Plaintiff lacks standing, because he has neither terminated the Agreement early nor stated that he plans to terminate the Agreement early; thus, Plaintiff has alleged a "speculative, hypothetical injury" that falls short of Article III's case-or-controversy requirement.  (Timepayment's Mem. at 12-14.)  Plaintiff argues that the early termination provision violates his substantive rights and creates a material risk of harm to his rights under the CLA; thus, the harm occurred when he signed the Agreement.  (Pl.'s Mem. at 10-18.)

The Fourth Circuit has yet to address whether a lessee has standing under § 1667b(b) to challenge the reasonableness of an early termination provision contained in a lease without actually terminating the lease early, intending to terminate the lease early or otherwise having the early termination provision applied to them.  However, other courts have answered this question in the negative.  *See Miller*, 362 F.3d at 221 ("[Lessees] never paid the early termination charge. . . . Therefore, they were not harmed by it, even assuming it is unreasonable and violates § 1667b(b).  They nevertheless suffered no 'injury in fact' because of it."); *Kedziora v. Citicorp Nat. Servs., Inc.*, 780 F. Supp. 516, 523 (N.D. Ill. 1991), *aff'd sub nom. Channell v. Citicorp Nat. Servs., Inc.*, 89 F.3d 379 (7th Cir. 1996) ("[A] plaintiff bringing a claim under Section 1667b(b) has no standing to litigate the reasonableness of a lease provision that caused him or her no actual injury because it never became applicable to him[.]"); *see also Higginbotham v. Ford Motor Credit Co.*, 270 F. App'x 864, 868 (11th Cir. 2008) (finding that lessee had standing to challenge reasonableness of early termination provision, because "Ford applied the early termination charge to [lessee] and instituted a legal action against [her] to collect the charge.").

The Agreement's Early Termination provision provided that Plaintiff may voluntarily terminate the Agreement if he is not in default by providing written notice to Timepayment. (Agreement § 20.)  Timepayment may also terminate the Agreement if Plaintiff defaults.

(Agreement § 20.) In either event, the Agreement requires that Plaintiff pay an "Early Termination Balance," consisting of (1) all amounts owed under the Agreement as of the date of the termination; (2) "the present value of all unpaid Lease Payments through the end of the lease Term, discounted at the rate of 4%;" and, (3) any expenses incurred as a result of the termination. (Agreement § 20.) Plaintiff argues that the early termination provision ignored the reasonableness requirement of § 1667b(b), because "no matter how early Plaintiff terminates the Agreement, he must nevertheless pay the *entirety* of the future monthly obligations still owed under the contract[;]" thus, the Agreement makes no concession based on the "anticipated or actual harm caused by the . . . early termination[.]" (Compl. ¶¶ 163-64 (quoting 15 U.S.C. § 1667b(b)).)

Assuming that the Early Termination provision does not comport with the reasonableness requirement of § 1667b(b), the undersigned agrees with Timepayment that, based on the Eleventh Circuit's decision in *Higginbotham*, 270 F. App'x at 868, and the Third Circuit's decision in *Miller*, 362 F.3d at 221, Plaintiff's allegations in Count II do not satisfy the "actual or imminent" element of the injury in fact analysis. Plaintiff remains current on his lease payments under the Agreement and has alleged no intention or desire to terminate the Agreement early, nor has Timepayment attempted to enforce the early termination provision against him. (Compl. ¶ 50.) Thus, Plaintiff has not suffered any harm as a result of the early termination provision. (Compl. ¶ 50.)

That said, a "substantial risk" of harm, "which in turn may prompt a party to reasonably incur costs to mitigate or avoid that harm," may establish an injury in fact in some circumstances. *Beck v. McDonald*, 848 F.3d at 275 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)); *see, e.g.*, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 155

(2010) (finding farmers had standing to challenge deregulation of herbicide based on substantial

risk that their crops would become infected with an engineered gene, because farmers would

have to conduct new tests and incur additional costs to continue to market crops as non-

genetically modified).  But here, Plaintiff has neither terminated the lease nor stated that he

intends to terminate the lease, and Timepayment has not enforced the early termination provision

against him.  Rather, Plaintiff has alleged a purely hypothetical injury that may never occur if he

decides not to terminate his lease early.  *See Kedziora*, 780 F. Supp. at 523 ("[Lessees] cannot

litigate a disclosed provision that had no impact whatever on them, just on the basis that it would

have been unreasonable as to some hypothetical other lessee."); *see also South Carolina v.

United States*, 912 F.3d 720, 727 (4th Cir. 2019) (deeming "chain of possibilities" giving rise to

South Carolina's alleged injury — "becoming 'the permanent repository of weapons-grade

plutonium'" — too speculative to establish injury in fact (citation omitted)); *Beck*, 848 F.3d at

275 (finding "attenuated chain of possibilities" resulting in the increased risk of future identify

theft insufficient to establish injury in fact).

    Plaintiff argues that *Miller* and other authorities relied upon by Timepayment predate the

Supreme Court's decision in *Spokeo*, 136 S. Ct. at 1550, and the Second Circuit's decision in

*Strubel*, 842 F.3d at 190.  (Pl.'s Resp. at 16 n.5.)  Applying the principles from those later cases,

Plaintiff asserts that Timepayment's violation of § 1667b(b) *alone* satisfies Article III's injury-

in-fact requirement, because "Congress specifically sought to protect lessees from unreasonably

onerous early termination penalties *divorced from the realities resulting from such an early

termination.*"  (Pl.'s Resp. at 16 (emphasis added).)  Thus, Plaintiff argues that he suffered the

harm that Congress enacted the CLA to prevent as soon as he signed the Agreement and became

threatened by the allegedly unreasonable penalties contained in the Early Termination provision. (Pl.'s Resp. at 16.)

As explained above, Congress enacted the CLA to prevent the "deception, misinformation, and obliviousness to the true costs of . . . lease terms . . . encountered by inexperienced or uninformed consumers." *Monitech*, 2017 WL 6519024, at *3. Here, Plaintiff has not alleged that the Agreement's early termination provision deceived him, or that he misunderstood the charges associated with Early Termination. While § 1667b(b) aims to protect lessees from unreasonable early termination charges, the undersigned finds no support for Plaintiff's assertion that Congress intended to do so "divorced from the realities resulting from such an early termination." (Pl.'s Resp. at 16.) Accordingly, the undersigned will not recategorize Plaintiff's purely speculative and hypothetical injury as the type of statutory violation that may alone confer standing to an individual.

Because Plaintiff failed to allege that he terminated his lease early, intends to terminate his lease early or that Timepayment enforced the early termination provision against him, Plaintiff has failed to establish an actual or imminent injury in fact in Count II.

### 3.    *Plaintiff Lacks Standing in Count IV.*

In Count IV, Plaintiff alleges that the Agreement improperly waived rights guaranteed to him by the Virginia Uniform Commercial Code ("UCC"). (Compl. ¶¶ 185-203 (citing Va. Code § 8.9A, *et seq.*).) Timepayment again argues that Plaintiff lacks standing to bring this claim, because Plaintiff's rights under the Virginia UCC only accrue upon default. (Timepayment's Mem. at 14-17.) Because Plaintiff has not defaulted under the Agreement and remains current on his payments, Timepayment describes Plaintiff's allegations in Count IV as another purely speculative, hypothetical injury insufficient to confer standing. (Timepayment's Mem. at 14-17.)

22

In response, Plaintiff argues that the Agreement violated § 8.9A-609 of the Virginia UCC, which provides that a secured party may repossess collateral with or without judicial process, so long as the repossession does not breach the peace. (Compl. ¶ 193.) Here. the Agreement allows Timepayment to repossess the heat pump in the event of Plaintiff's default, without mention of using judicial process or refraining from breaching the peace. (Compl. ¶ 194; Agreement§ 19.)  Second, Plaintiff argues that the Agreement violated § 8.9A-614, which requires secured parties to provide adequate notice — including, *inter alia*, "a description of the debtor, the secured party, the collateral that is the subject of the intended disposition, and the method of intended disposition . . ." — before disposing of the debtor's collateral. (Compl. ¶¶ 195-96.)  The Agreement requires only that Timepayment provide Plaintiff with notice of termination in the event of default, without the specifications set forth in § 8.9A-614. (Compl. ¶ 197; Agreement § 20.)  Finally, Plaintiff argues that the Agreement violated § 8.9A-620(g), which prohibits a secured party from "accepting collateral in . . . *partial* satisfaction of the obligation that collateral secures." (Compl. ¶¶ 91, 191 (emphasis supplied).)  If Plaintiff defaults, Timepayment may accept the returned heat pump, but the Agreement also permits Timepayment to sue Plaintiff for any remaining payments owed. (Compl. ¶ 199; Agreement § 19.)

Under Virginia law, "[i]t is the secured party's repossession of the collateral, not necessarily the default, that triggers the notice requirement." *Barnette v. Brook Rd., Inc.*, 457 F. Supp. 2d 647, 659 (E.D. Va. 2006); *Cappo Mgmt. V. Inc. v. Britt*, 711 S.E.2d 209, 212 (Va. 2011) (quoting *Barnette*, 457 F. Supp. 2d at 659); *see also In re Moffett*, 356 F.3d 518, 521–22 (4th Cir. 2004) ("[T]he UCC grants certain rights to the debtor *upon repossession* and otherwise imposes duties on a secured creditor in possession of collateral." (emphasis added)).  Here,

23

Plaintiff remains current on his payments under the Agreement and Timepayment has not taken any action against him (i.e., no attempts to repossess the heat pump) to suggest that Plaintiff has defaulted. (Compl. ¶ 50.) Just as Plaintiff suffered no harm from the early termination provision absent early termination, Plaintiff has suffered no harm from the missing UCC provisions, absent default and Timepayment's repossession of the heat pump. Accordingly, Plaintiff again failed to state an actual or imminent injury in fact that satisfies Article III. *Beck*, 848 F.3d at 275; *Miller*, 362 F.3d at 221. Thus, Count IV fails for lack of standing.[8]

### B.  Plaintiff Successfully States a Claim in Counts III and V.

Timepayment moves to dismiss Counts III and V pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiff has failed to state a claim under the TILA (Count III) and Virginia Code § 6.02-303(A) (Count V). For the reasons set forth below, the undersigned finds that Plaintiff has stated a plausible right to relief under both counts.

---

[8]     Timepayment alternatively moves to dismiss Count IV under Rule 12(b)(6) for failure to state a claim under Va. Code § 8.9A-602. (Timepayment's Mem. at 21.) Timepayment argues that the Agreement does not create a security interest under the UCC, because the Agreement "is subject to termination by the lessee," and because "the lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration." (Timepayment's Mem. at 21 (quoting definition of "security interest" under Va. Code § 8.1A-203(b).) For the reasons discussed below, the Court cannot conclude that the purchase option in the Agreement constitutes more than nominal consideration. However, § 20 of the Agreement expressly provides that Plaintiff may terminate the Agreement early. (Agreement § 20.) Plaintiff describes his right to terminate as "illusory," because he will incur harsh penalties for ending the Agreement early. (Pl.'s Resp. at 27.) But the Virginia UCC does not require the lessor to have the ability to terminate an agreement without penalty to create a security interest, and the undersigned declines to read such a requirement into the statute. Va. Code § 8.1A-203(b). Because Plaintiff can terminate the Agreement early, the Agreement does not create a security interest under Virginia Code § 8.1A-203.

### I.    The Agreement Can Plausibly be Construed as a "Credit Sale" Under the TILA.

In Count III, Plaintiff alleges that the Agreement violates the disclosure requirements set forth in § 1638(a) of the TILA, because it failed to disclose the true financing cost of the heat pump. (Compl. ¶¶ 171-84.)  Timepayment argues that the Agreement constitutes a "consumer lease" as defined in Regulation M[9] — not a "credit sale" under the TILA — thus, the TILA does not apply.  (Timepayment's Mem. at 18-19.)  Plaintiff asserts that the Agreement constitutes a credit sale "disguised" by Timepayment as a consumer lease.  (Compl. ¶54; Pl.'s Resp. at 23.)

Under the TILA and its implementing regulation, 12 C.F.R. § 1026.2(a) ("Regulation Z"), the term "credit sale" "includes a bailment or lease (unless terminable without penalty at any time by the consumer)" whereby the consumer:

> (i) Agrees to pay a sum substantially equivalent to, or in excess of, the total value of the property and service involved; and
>
> (ii) Will become (or has the option to become), for no additional consideration or for nominal consideration, the owner of the property upon compliance with the Agreement.

12 C.F.R. § 1026.2(a)(16); 15 U.S.C. § 1602(h).  Here, the Agreement provides that Plaintiff can purchase the heat pump at the end of the lease term "for its fair market value, not to exceed 3 regular monthly payments [of $410.44]."  (Agreement at 1.)

Timepayment argues that the option to purchase the pump at the end of the lease for fair market value constitutes more than nominal consideration; thus, the Agreement does not qualify

---

[9]    Regulation M defines a consumer lease as "a contract in the form of a bailment or lease for the use of personal property by a natural person primarily for personal, family, or household purposes, for a period exceeding four months and for a total contractual obligation not exceeding the applicable threshold amount [$54,600], whether or not the lessee has the option to purchase or otherwise become the owner of the property at the expiration of the lease."  12 C.F.R. § 1013.2(e)(1); 12 C.F.R. § 1013, Supp. I, cmt. 2(e)(11)(viii).

as a credit sale under the TILA and Regulation Z.  (Timepayment's Reply at 12-14.)  The Third

Circuit has held that the option to purchase goods at the end of a lease for approximate fair

market value "is generally considered to be more than nominal;" thus, such leases "generally" do

not constitute credit sales under the TILA.  *Ortiz v. Rental Mgmt.*, 65 F.3d 335, 342 (3d Cir.

1995) (citation and quotation omitted).  Here, the lease caps the fair market value of the heat

pump at three monthly payments of $410.44, totaling $1,231.32, which may amount to less than

fair market value at the end of the lease term.  (Agreement at 1.)

The fact that the Agreement caps fair market value does not render the consideration

nominal, according to Timepayment, because $1,231.32 "is well above the threshold amount that

courts have held to be nominal consideration."  (Timepayment's Mem. at 20 (citing *In re Dunn*

*Bros., Inc.*, 16 B.R. 42, 46 (Bankr. W.D. Va. 1981) (finding that option to purchase equipment

for ten percent of original purchase price constituted nominal consideration under Virginia

UCC); *see also Garcia Enterprises, Inc. v. Enter. Ford Tractor, Inc.*, 480 S.E.2d 497, 499 (Va.

1997) (option to purchase car for $1 constituted nominal consideration).[10]

The court in *Dunn Brothers* applied the "economic realities test" to determine whether

the purchase option in an equipment lease offered purchase for only nominal value.  16 B.R. at

---

[10]     Aside from the Third Circuit's proclamation in *Ortiz*, courts have provided limited
guidance as to what constitutes nominal consideration for the purpose of identifying credit sales
under the TILA.  Accordingly, the Court will draw from the analogous context of secured
transactions, on which the parties have also relied to support their arguments.  (Timepayment's
Mem. at 18-19; Pl.'s Resp. at 25-26.)  Similar to the definition of credit sale under the TILA,
§ 8.1A-203 of the Virginia UCC distinguishes a lease from a security interest.  A lease creates a
security interest if the agreement "is not subject to termination by the lessee" and "the lessee has
an option to become the owner of the goods for no additional consideration or for nominal
additional consideration upon compliance of with the lease agreement."  Va. Code § 8.1A-
203(b)(4).  The Virginia UCC further provides that "[a]dditional consideration is not nominal if .
. . the price is stated to be the fair market value of the goods determined at the time the option is
to be performed."  Va. Code § 8.1A-203(d)(2).

46 ("The definition of a 'nominal consideration' may vary, but the best formula for determining whether a lessee may purchase leased property for a 'nominal' sum has been described as the 'economic realities' test." (citing J. White & R. Summers, Uniform Commercial Code, § 22-3 at 881 (2d ed. 1980))). The test requires the Court to ask whether "the only economically sensible course for the lessee is to exercise the option to purchase the property[.]" *Id.* If so, "then the agreement is a security agreement." *Id.* In other words, "if the price . . . is much less than fair market value of the property, then the lessor has recognized an equity in the lessee, and the lease was intended as a security agreement." *Id.*

Applying the economic realities test, the *Dunn Brothers* court held that the purchase option contained in the equipment lease — "10% of the original equipment cost, or $3,490.00" — constituted a nominal amount, because the lessors agreed to pay over $52,000 over the term of the lease for a piece of equipment valued at $34,000. *Id.* Moreover, "the equipment had a useful life of ten to twenty years, and . . . its fair market value at the end of its useful life could be expected to equal its initial acquisition cost." *Id.*; *cf. In re Architectural Millwork of Virginia, Inc.*, 226 B.R. 551, 555 (Bankr. W.D. Va. 1998) (holding that $9,625.00 did not constitute a nominal amount, "particularly in light of the agreement's capitalized cost of only $38,500[ ]" and the fact that the parties testified that $9,625 "was a fair estimate . . . of the vehicle's value at the conclusion of the lease payments").

Here, the capped fair market value amount of $1,231.32 equals 13 percent of the initial cost of the heat pump, including installation. (Compl. ¶ 60.) Plaintiff asserts that this amount is nominal, because "any rational consumer *would* exercise his purchase option after having already paid for professional installation of the pump, and given the *need* for the pump and the effort and expense that would be required to return it instead." (Pl.'s Resp. at 24.) Timepayment

argues that Plaintiff's estimate overvalues the heat pump's fair market value, which will depreciate by the end of the lease term and does not include installation costs. (Timepayment's Mem. at 20 n.12.) Thus, $1,231.32 likely represents a substantially higher percentage of the cost of the pump. (Timepayment's Mem. at 20 n.12.) The parties' focus on percentages misses the mark, because no "bright line test" or exact percentage renders consideration nominal. *See In re Architectural Millwork of Virginia, Inc.*, 226 B.R. at 555-56 (noting that courts must consider all of the factors of the case to determine whether a lease constitutes a disguised security agreement).

The Agreement caps fair market value of the heat pump at $1,231.32, but it gives no indication whether that amount represents a fair estimate of the value of the heat pump at the end of the lease term. (Agreement at 1); *In re Architectural Millwork of Virginia, Inc.*, 226 B.R. at 555. Nor does the Court have any information about "whether [the heat pump's] fair market value at the end of its useful life could be expected to equal its initial acquisition cost." *In re Dunn Bros.*, 16 B.R. at 46. Viewing the facts in the light most favorable to Plaintiff, as the Court must do at this stage of the litigation, $1,231.32 *may* represent an amount substantially less than the fair market value of the heat pump at the end of the lease term, thereby constituting nominal consideration.

Moreover, Plaintiff cannot terminate the Agreement without penalty (i.e., paying the total lease amount, regardless of how early in the lease term that he decides to terminate), which serves as another factor that courts consider to determine whether a lease constitutes a credit sale under the TILA. (Agreement § 20); *see e.g., Cisneros v. McDonald*, 2007 WL 9711700, at *3 (N.D. Ala. Nov. 20, 2007) (holding that plaintiff plausibly alleged facts showing that lease was a credit sale under the TILA, because he likely would be penalized by having to continue to make

monthly rent payments despite termination). Because the Agreement's purchase option is potentially less than fair market value, and because Timepayment will penalize Plaintiff for early termination, the Agreement can plausibly be construed as a credit sale under the TILA.

### 2. *Plaintiff Sufficiently Alleged Violations of 15 U.S.C. §§ 1638(a)(3)-(5).*

In contrast to Plaintiff's CLA claims, Plaintiff has alleged concrete injuries in fact under the TILA. Specifically, Plaintiff asserts that the Agreement violated § 1638(a) of the TILA, because it failed to disclose the "the finance charge, not itemized, using that term[;]" "the finance charge expressed as an 'annual percentage rate,' using that term[;]" and, "the sum of the amount financed and the finance charge, which shall be termed the total of payments." (Compl. ¶¶ 172-76); 15 U.S.C. §§ 1638(a)(3)-(5). When viewed as a credit sale, the Agreement carries a finance charge between at least $3,678.96 (if Plaintiff returns the heat pump) and $4,910.29 (if Plaintiff purchases the heat pump). (Compl. ¶ 47.) Expressed as an APR, the finance charge ranges between 69 and 92 percent. (Compl. ¶ 48.) Plaintiff asserts that "by styling [the Agreement] as a lease, [Timepayment] obfuscated the exorbitant cost of the credit it extended to him." (Compl. ¶ 64.) Had the Agreement contained the disclosures required by §§ 1638(a)(3), (4) and (5), Plaintiff claims that "he would have pursued alternative financing options." (Compl. ¶¶ 183-84.) By stating how the missing disclosures adversely affected his behavior, Plaintiff alleged facts sufficient to establish standing under Article III. *Monitech*, 2017 WL 6519024, at *2-3 (citing *Spokeo*, 136 S. Ct. at 1546; *Dreher*, 856 F.3d at 344-46).

Even if Plaintiff has standing to assert a TILA claim — which the undersigned finds that he does — Timepayment argues that Plaintiff's "formulaic recitation" of the TILA does not satisfy the *Twombly/Iqbal* standard, "because it fails to adequately inform Timepayment of the true nature of the TILA claims and because it fails to allege any facts to support the purported

violations." (Timepayment's Mem. at 24.) In his Complaint, Plaintiff stated that the Agreement violated § 1638(a) in several ways," and then proceeded to list the disclosures required by § 1638(a)(3) (finance charge), § 1638(a)(3)(4) (APR) and § 1638(a)(5) (total of payments) as a few examples of the "several" TILA violations. (Compl. ¶ 176.) The Agreement does not comply with those three provisions of § 1638(a), because it does not disclose the "finance charge" or "annual percentage rate," and it defines the "total of payments," as the total monthly rent payments, excluding the initial payment. (Agreement at 1.) Accordingly, Plaintiff has sufficiently alleged violations of §§ 1638(a)(3), (4) and (5) *only*. If he wishes to assert additional violations of § 1638(a), he would need to seek leave to amend.

Lastly, Timepayment argues that the Agreement cannot constitute a credit sale under the TILA *and* a consumer lease under the CLA, because Regulation M "does not cover a lease that meets the definition of a credit sale in Regulation Z." (Timepayment's Reply at 4-5 n.3 ("Plaintiff cannot have it both ways — either the CLA applies or the TILA applies.")); 12 C.F.R. § 1013, Supp. I, cmt. 2(e)(4). But "[a] party may state as many separate claims . . . as [he] has, regardless of consistency[,]" and he may also plead claims "alternatively or hypothetically." Fed. R. Civ. P. 8(d)(2)-(3). At this early stage of the proceedings, Plaintiff has alleged facts sufficient to establish that the Agreement constitutes a consumer lease under the CLA or, in the alternative, a credit sale under the TILA.

**C.    Plaintiff States a Plausible Claim Under Virginia's Usury Statute.**

Finally, in Count V, Plaintiff argues that the Agreement violates Virginia Code § 6.2-303(A), which prohibits contracts "made for the payment of interest on a loan at a rate that exceeds 12 percent per year." (Compl. ¶¶ 204-14.) Plaintiff calculates the Agreement's interest rate to exceed 77 percent, based on the purchase price and installation cost of the heat pump

($5,325) and the total lease value (between $9,004.96 and $10,235.28, depending on whether Plaintiff exercises his purchase option). (Compl. ¶¶ 210-12.) Timepayment argues that Virginia's restrictions on usurious interest rates do not apply to leases or credit sales. (Timepayment's Mem. at 25; Timepayment's Reply at 17.)

"To constitute usury there must be a loan of money or a forbearance of an existing indebtedness. Without such, there can be no violation of any usury law." *Galloway*, 2012 WL 113862, at *3. Applying § 6.2-303, this Court has defined a "loan" as "an advancement of money under a contract or stipulation, whereby the person to whom the advancement is made binds himself to repay the sum at some future time, together with such other sum as may be agreed upon for the use of the money advanced." *Id.* (citing *Brill v. Smeltzer*, 29 Va. Cir. 292 (1992)). A "forbearance," on the other hand, "denotes a contractual obligation of a lender to refrain from requiring a borrower to repay a debt for a certain period time." *Id.*

Timepayment argues that the Agreement — when construed as a consumer lease — falls outside the purview of Virginia's usury law, which applies only to a loan or forbearance. (Timepayment's Reply at 18.) Virginia courts have yet to address this issue, but others have determined that a lease does not qualify as a loan or forbearance for usury purposes. *See, e.g.*, *T.F. James Co. v. Vakoch*, 604 N.W.2d 459, 461 (N.D. 2000) ("A lease is neither a loan nor a forbearance subject to the usury statutes." (quoting 45 Am. Jur. 2d Interest and Usury § 130 (1999))); *Orix Credit All.*, 222 A.D.2d 796, 797-98 (N.Y. App. Div. 1995) ("[A] lease does not constitute a loan or forbearance of money, it does not fall within the definition of usury[.]"); *Agristor Leasing v. Barlow*, 180 A.D.2d 899, 901 (N.Y. App. Div. 1992) ("The subject instrument is unequivocal and replete with recitations and a legend indicating that it is a lease and that plaintiff is the owner of the equipment. Therefore, [the lower court] correctly held the

31

agreement to be a lease and the defense of usury was inapplicable."). Construing the Agreement as a consumer lease, Plaintiff's usury claim fails. But the Court's analysis cannot stop here, because Plaintiff has alleged facts showing that — at least at this early stage of the litigation — the Agreement could constitute a credit sale under the TILA.

Timepayment asserts that, even if the Court views the Agreement as a credit sale, Virginia's usury law does not apply for two reasons. First, Timepayment argues that the Agreement falls within one of the statutory exceptions to the 12-percent cap set forth in § 6.2-303(A), because the parties agreed by express contract to an interest rate higher than 12 percent. (Timepayment's Reply at 18 n.15 (citing Va. Code § 6.2-311)). Section 6.2-311 of the Virginia Code provides that "[a]ny seller of goods or services who extends credit under a closed-end installment credit plan or arrangement may impose finance charges at such rate or rates as the seller and the purchaser have agreed." Va. Code § 6.2-311; *see Alston v. Crown Auto, Inc.*, 224 F.3d 332, 335 n.2 (4th Cir. 2000) ("Under Virginia law, a creditor cannot charge more than twelve-percent interest . . . unless the seller and buyer expressly agree to a different rate[.]" (citing Va. Code §§ 6.1-330.55, 330.77 (former versions of §§ 6.2-303, 311))); *Scott v. WFS Fin., Inc.*, 2007 WL 190237, at *7 (E.D. Va. Jan. 18, 2007) (same). This argument fails, because the facts alleged show that the parties did not expressly agree to the finance charge or interest owed under the Agreement. (Compl. ¶¶ 53, 64-68.) By failing to disclose this information, Plaintiff asserts that Timepayment "deprived him of the ability to shop intelligently for alternative financing." (Compl. ¶ 68); *see Estate of Curry v. Anderson*, 80 Va. Cir. 39 (2010) (holding that complaint sufficiently alleged a usurious loan that did not fall under statutory exception for contracting parties, because the documents did not make clear what rates defendant charged plaintiff for the loan). Thus, the exception set forth in § 6.2-311 does not apply.

Second, Timepayment argues that the Agreement, viewed as a credit sale, falls outside

Virginia's usury law, because Virginia follows the "long established theory of 'time price

differential,'" which provides that:

> [T]he vendor of property may charge one price for immediate cash payment or a
> different price if payment is to be made at a future date or in installments. The
> former is the cash price, the latter the time price and the difference is the time
> price differential. Such a sum is not considered interest in the strict sense and
> may exceed an amount which, if considered interest, would be usurious.

(Timepayment's Reply at 19 n.17 (quoting *Gen. Elec. Credit Corp. v. Lunsford*, 167 S.E.2d 414,

418 (Va. 1969) (additional citations omitted).)

Indeed, this Court has previously found Virginia's usury law inapplicable to a timeshare

agreement carrying a high finance charge, reinforcing Virginia courts' adherence to the time

price differential theory. *Galloway*, 2012 WL 113862, at *1, 3 (granting defendant's motion to

dismiss usury claim). In *Galloway*, the plaintiff entered into a timeshare plan and agreed to pay

a total of $23,372.80 in 120 monthly installments, including $11,950 for the property and a

finance charge of $11,422.80. *Id.* at *1. The Court construed the timeshare agreement as a bona

fide sale; thus, Virginia usury law did not apply. *Id.* at *3; *see also Kidd v. Bros.*, 183 S.E.2d

140, 141 (Va. 1971) ("At least since 1873, it has been settled in Virginia that usury does not

attach to [b]ona fide sale transactions."); *Graeme v. Adams*, 64 Va. 225, 234 (1873) ("In all cases

where property, goods or things . . . are [bona fide] sold, . . . the courts hold that usury cannot

attach for the want of a loan." (citations and additional quotations omitted)); *Brill*, 29 Va. Cir. at

292 ("Virginia has long followed the same rule that interest charged on a bona fide sale is not

usurious.").

Like § 6.2-311, the time price differential theory exempts only interest rates "fairly

agreed" upon by contracting parties from the reach of Virginia's usury law. *Graeme*, 64 Va. at

234. In *Graeme*, the Supreme Court of Virginia explained that parties contracting for the sale of goods (or property or labor) may agree to extend credit for "as large an addition to the cash price as may suit themselves. . ., and it is wholly immaterial whether the enhanced price be ascertained by the simple addition of a lumping sum to the cash price, or by a [percentage] thereon." *Id.* This type of transaction is not usurious, because:

> It is neither a loan or the forbearance of a debt, but simply the contract price of work and labor done or property sold; and the difference between cash and credit in such cases, whether six, ten or twenty [percent] must be left exclusively to the contract of the parties; and no amount of difference *fairly agreed on* can be considered illegal.

*Id.* (emphasis added).

In contrast, the facts alleged here show that the parties did not fairly agree to the finance charge or interest owed under the Agreement. (Compl. ¶¶ 64-68.) Plaintiff asserts that he specifically inquired to Timepayment about the interest rate associated with the Agreement, "but [was] told that there is no interest rate to disclose — because the Agreement is a lease[.]" (Compl. ¶ 53.) Indeed, the Agreement contains no information about the total amount financed or the APR — it discusses costs only in terms of Plaintiff's initial and monthly payments. (Agreement at 1.)

Unlike the high finance charge agreed upon by the parties in *Galloway*, 2012 WL 113862, at *1, 3, the facts alleged here more closely resemble those set forth in *Hummel v. Hall*, 868 F. Supp. 2d 543 (W.D. Va. 2012), on which Plaintiff relies in support of his argument that he can simultaneously recover under the TILA and Virginia usury law. (Pl.'s Resp. at 29-30.) The plaintiff in *Hummel* signed a buyer's order to purchase a vehicle for $4,500 from the defendant and made monthly payments of $250 for approximately one year. 868 F. Supp. 2d at 547. After paying $3,000, the plaintiff discovered that he still owed $6,000 on his vehicle — an amount significantly more than the $4,500 purchase price. *Id.* When he inquired about the high balance,

the defendant presented the plaintiff with a retail installment sales contract ("RISC"), which the plaintiff neither signed nor read when he purchased the vehicle. *Id.* The RISC imposed a 28 percent APR. *Id.* The plaintiff brought suit, alleging that the defendant violated § 1638(a) of the TILA by failing to disclose, *inter alia*, the finance charge, APR and total of payments associated with the car purchase. *Id.* at 547-48. The plaintiff also alleged that he paid a usurious interest rate during the year that he made monthly car payments. *Id.* at 557-58. When the defendant did not participate in the litigation, the plaintiff sought default judgment and the court awarded the plaintiff damages on both claims. *Id.* at 556-58.

Similarly, here, the Agreement did not disclose the finance charge, APR or total of payments owed by Plaintiff in accordance with § 1638(a) of the TILA. Plaintiff inquired about interest rates, but Timepayment told him that the Agreement carried none. (Compl. ¶ 53.) Had Timepayment complied with the TILA and properly disclosed the finance charge and interest rate attached to Plaintiff's use of the heat pump, then the Agreement would resemble the type of transaction exempt from Virginia's 12 percent interest cap, because the parties would have expressly agreed to a higher interest rate. Va. Code § 6.2-311; *Graeme*, 64 Va. at 234. But Timepayment's failure to disclose the true financing costs to Plaintiff removes the Agreement from the protections extended to contracts made under § 6.2-311 and the time-price differential theory. *See Hummel*, 868 F. Supp. 2d at 556-58 (awarding plaintiff damages under the TILA and Virginia's usury law based on defendant's wrongful concealment of finance terms). Accordingly, the undersigned finds that, at this stage of the proceedings, Plaintiff has sufficiently alleged that the Agreement — construed as a credit sale under the TILA — carries a usurious interest rate in violation of § 6.2-303(A). Therefore, Defendant's motion to dismiss must fail as to Count V as well.

## CONCLUSION

For the reasons set forth above, the Court recommends that Timepayment's Motion be GRANTED in part and that Counts I, II and IV of Plaintiff's Complaint be DISMISSED. The Court further recommends that Timepayment's Motion be DENIED as to Counts III and V.

Let the clerk forward a copy of this Report and Recommendation to all counsel of record and to United States District Judge M. Hannah Lauck.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

                                                        /s/
                                        _____

                                        David J. Novak
                                        United States Magistrate Judge

Richmond, Virginia
Date: February 5, 2019